**BEFORE THE UNITED STATES JUDICIAL PANEL**
**ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: THE COOPER COMPANIES, INC., IN VITRO FERTILIZATION GLOBAL CULTURE MEDIA PRODUCTS LIABILITY LITIGATION | MDL No. 3122 |

**RESPONSE OF INTERESTED PARTIES THE COOPER COMPANIES, INC., AND COOPERSURGICAL, INC., IN OPPOSITION TO PLAINTIFFS A.B., C.D., F.G., AND H.I.'S MOTION TO TRANSFER AND CENTRALIZE RELATED ACTIONS FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

The Cooper Companies, Inc., and CooperSurgical, Inc., oppose transfer and coordination or consolidation under 28 U.S.C. § 1407 because centralization is not necessary for the convenience of the parties and witnesses or to further the just and efficient conduct of this litigation, particularly when alternatives to centralization have not been pursued or exhausted. The Panel should therefore deny Plaintiffs' motion in its entirety.

## INTRODUCTION

This litigation is about *in vitro* fertilization ("IVF"). Under the best of circumstances, IVF is notoriously precarious and uncertain, and its success depends upon countless variables. In their lawsuits, Plaintiffs blame one of those countless variables for the loss of their embryos and eggs— the chemical constituency of the culture media manufactured by CooperSurgical and used by Plaintiffs' varied IVF providers.[1] CooperSurgical does not sell its culture media directly to

---

[1] Although CooperSurgical manufactured the culture media at issue, Plaintiffs have also sued Cooper Companies, CooperSurgical's indirect corporate parent of CooperSurgical. Cooper Companies is based in San Ramon, California. Cooper Companies and CooperSurgical believe Plaintiffs in the California cases sued Cooper Companies in an attempt to establish venue in the Northern District of California. The validity and sufficiency of the joinder of The Cooper Companies is currently under consideration by Judge Tigar in the Northern District of California.

patients, but rather in bulk to IVF providers/clinics, who then make all key decisions about how it is used.

In support of centralization, Plaintiffs identify a handful of overlapping issues, which, they contend, justify transfer. But in truth, given the multitude of factors affecting embryonic development, the issues they identify are peripheral to the individualized questions about how and why each embryo failed to thrive, the policies, practices, and procedures of each of the more than sixty different IVF providers who received the recalled media, and the health and medical history of each patient. These and other intensely individualized questions make centralized proceedings unworkable, unmanageable, and inefficient.

## FACTS

IVF is fraught with peril and uncertainty, because its success depends upon so many variables, most of which have nothing to do with the culture media product used and more to do with the individualized practices and procedures of IVF clinics. This litigation involves one of those variables: global culture media formulated by CooperSurgical in Trumbull, Connecticut, and manufactured by CooperSurgical at its facility in Costa Rica on one day in October 2023. The media at issue was shipped to independent vendor Embryotech Laboratories Inc. in Haverhill, Massachusetts, for mouse embryo assay quality testing prior to distribution to more than sixty different fertility clinics in the United States and many more around the world. Embryotech told CooperSurgical that the media had passed its testing, and CooperSurgical relied on Embryotech's results and distributed the media. However, unbeknownst to CooperSurgical, Embryotech's testing failed to follow agreed protocols and industry standards, and Embryotech should not have passed the subject lots. Thus, three lots of global culture media were distributed to clinics that should have

failed the mouse embryo assay testing, and in December 2023, CooperSurgical voluntarily issued a Class 2 recall.

Absent Embryotech's failures to properly test the media, the media would not have been released to clinics, the recall would never have occurred, and the Plaintiffs would have no good faith basis, however speculative at this point, to assert any damages claims against CooperSurgical. Embryotech is not currently a defendant; however, CooperSurgical may assert claims against it at the appropriate time, and, presumably, Plaintiffs may amend their complaints to name Embryotech as a defendant.

The IVF community has identified many variables impacting the potential success of IVF. In 2018, international experts met in Cairo, Egypt, to develop consensus guidelines for IVF laboratories and published those guidelines in 2020. *'There is only one thing that is truly important in an IVF laboratory: everything,' Cairo Consensus Guidelines on IVF Culture Conditions*, 40 RBMO 33 (2020) (Ex. 1). The *Consensus Guidelines* emphasize that it is "important to recognize that the embryo culture medium is but one among perhaps hundreds of factors in the IVF laboratory that might affect the outcome of any given cycle." *Id*. at 35. Those factors include "every pipette tip, holding tube and culture dish that is in contact with any of several media." (*Id*.) "Laboratory apparatus, gases and procedures could all have effects independent of the culture medium:  the fact that a developmental anomaly or failure appears while the embryo is in a culture medium does not mean the medium is responsible for it." (*Id*.) The consensus group concluded, "There is only one thing that is truly important in an IVF laboratory:  everything." (*Id*.)

Some examples of the varying factors affecting IVF success illustrate just how elusive of centralization this litigation truly is:

- *Temperature*. The Consensus Guidelines explain that "[u]sing and maintaining the appropriate temperature during cell handling and culture is a critical component of optimizing an IVF culture system because improper temperatures can compromise cell function and development and hence reduce IVF outcomes." (Id. at 35.)

- *Humidity*. The Consensus Guidelines caution that "[p]reimplantation embryos require consistent culture conditions to reduce environmental stress and optimize their development." (*Id*. at 36.)

- *Carbon Dioxide*. The Consensus Guidelines emphasize that "[c]arbon dioxide control is paramount for culture media to maintain a physiological pH . . . ." (*Id*. at 37.)

- *Workstation Design and Engineering*. "[I]t is expected that the laboratory, its design, equipment and operational systems will provide optimal conditions for them," requiring selection of equipment that has been designed and engineered to maintain the correct biophysical and biochemical conditions for each step of the IVF process, and then calibrate and maintain the equipment to ensure it is fit for purpose." (*Id*. at 38.)

- *Dish Preparation and Incubators*. The Consensus Guidelines emphasize the importance of proper dish preparation and sterility and incubator performance; lack of proper preparation and maintenance jeopardizes egg and embryo viability. (*Id*. at 39.)

- *Oocyte (Egg) Recovery*. The manner of egg recovery obviously affects embryonic development, requiring proper recovery procedures. (*Id*. at 42.)

- *Sperm Preparation*. The Consensus Guidelines recognize that seminal plasma contains one or more factors that adversely affect sperm function, its ability to penetrate cervical mucus, undergo the acrosome reaction *in vitro* and the fertilization process generally." (*Id*.)

- *Light*. Even light affects the IVF process and must be carefully controlled. (*Id*. at 49.)

None of these factors is within the control of CooperSurgical. It is no wonder that success rates also vary widely from clinic to clinic. Compare, for example, the different success rates of clinics identified in two Complaints:  University of Iowa Hospitals and Clinics Center for Reproductive Care (ECF No. 45:1-23 at ¶ 74), and CNY Fertility Albany (ECF No. 45:1-9 at ¶ 52). According to data published by the CDC, the University of Iowa achieved the following rates of success for new patients having live-birth deliveries after one intended retrieval:

| New patients (with no prior ART cycles) | <35 | 35-37 | 38-40 | >40 |
|---|---|---|---|---|
| Percentage of new patients having live-birth deliveries after 1 intended retrieval | 73.2% | 63.0% | 36.2% | 8.3% |

Assisted Reproductive Technology (ART) Data for Univ. of Iowa (Ex. 2). In contrast, CNY Fertility Albany achieved roughly half the rate achieved by the University of Iowa:

| New patients (with no prior ART cycles) | <35 | 35-37 | 38-40 | >40 |
|---|---|---|---|---|
| Percentage of new patients having live-birth deliveries after 1 intended retrieval | 42.6% | 27.9% | 17.6% | 4.2% |

Assisted Reproductive Technology (ART) Data for CNY Fertility Albany (Ex. 3). Determining the reason a particular person's IVF failed necessarily encompasses consideration of the methods, practices, and procedures that lead to each clinic's own rate of success.

Ultimately, however, regardless of the quality of a clinic's practices and procedures or the rate of success a clinic achieves, the outcome of any IVF procedure depends predominantly on "[p]atient medical characteristics, such as age, diagnosis, and ovarian reserve … ." (Exs. 2-3.) Probing those individual medical characteristics and the interplay between them and each clinic's practices and procedures will dominate discovery and pretrial procedures in this litigation.

Indeed, Plaintiffs' complaints evince the individuality of their experiences and their claims. For example, in their putative class action complaint[2], the *F.G.* Plaintiffs recount their own individual experiences with the IVF process. Plaintiffs F.G. and H.I., although Virginia residents, sought IVF treatment at a facility in New York, and had eggs successfully fertilized in November 2023—i.e., before the recall—and those eggs were all later lost. (*F.G. and H.I. et al v. CooperSurgical et al.*, Case No. 4:24-cv-01261, Plfs. Amended Compl., ECF 53 at ¶¶ 15–16, 63–65.) Their Co-Plaintiffs T.U. and V.W., meanwhile, had their eggs fertilized on December 8, 2023, three days *after* CooperSurgical had notified IVF centers of its recall of the affected culture media. (*Id.* ¶¶ 54, 70; *also id.* at 10 n.11 & Ex. A.) So when T.U. and V.W. had their embryos placed in the culture media, their IVF treatment provider was on notice of the recall.

In addition, Plaintiffs F.G. and H.I. underwent IVF treatment to harvest four eggs from F.G., which were fertilized with H.I.'s sperm to yield four embryos. (*Id.* ¶¶ 63–65.) T.U. and V.W., meanwhile, used V.W.'s sperm with a *donor's* eggs, yielding six embryos. (*Id.* ¶¶ 69–71.) Unlike F.G. and H.I., not all of T.U. and V.W.'s were initially lost "due to Defendants' defective culture media," as one embryo remained and "developed to blastocyst, but was later determined through genetic testing to be chromosomally abnormal and thus unusable." (*Id.*)

Plaintiffs F.G. and H.I. allege concerns because "F.G. is older now tha[n] she was at the time the eggs used to create the lost embryos were retrieved" (albeit, only four months older at the time she filed this action). (*Id.* ¶ 67.) They allege that "embryos made with older eggs would not have as high of a chance of successfully developing into a healthy child or children." (*Id.*)

---

[2] CooperSurgical and Cooper Companies have moved to strike the class allegations in this complaint—the only one of these actions that was filed as a putative class action—based on the inherent individuality of these claims on numerous levels and the fact that varying and individualized factual and legal issues will overwhelmingly predominate.

Plaintiffs T.U. and V.W., meanwhile, also allege that they are both older now, but given they were using donor eggs, they allege that "embryos made with older sperm may not have as high of a chance of successfully developing into a healthy child or children, and Plaintiff T.U. faces heightened risks of possible health complications from carrying a child to term"—a concern Plaintiff F.G. did not allege. (*Id.* ¶ 73.) In other words, even the two sets of named plaintiffs in the *F.G.* complaint had different experiences and have different circumstances with respect to their distinct IVF journeys. And this is just based on their initial allegations—numerous other individual distinguishing circumstances and confounding factors will undoubtedly arise through discovery that will further reflect the impropriety of consolidating these proceedings in one central litigation.

## ARGUMENT

Plaintiffs have failed to meet their burden to establish that centralization is proper. *See In re: Best Buy Co., Inc., California Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1379 (J.P.M.L. 2011). The Panel will not order transfer unless the moving party establishes three elements. First, the moving party must establish existence of common questions of fact. *See* 15 Charles A. Wright *et al.*, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION AND RELATED MATTERS § 3863, at 380 (2007) (citing 28 U.S.C. § 1407). Commonality of questions of fact is seldom "sufficient, by itself, to justify granting the motion to transfer." *Id*. Second, the moving party must establish that consolidation will "serve the convenience of the parties and witnesses." *Id*. at 407. Third, the moving party must establish "that the just and efficient conduct of the actions will be served" by transfer and centralization. *Id*. at 413. Plaintiffs have not established any of these requirements, and, accordingly, their Motion to Transfer must be denied.

In addition to establishing common questions, convenience, and just and efficient conduct of the actions, the Panel also requires the parties to address what steps they have taken to pursue

alternatives to centralization (including, but not limited to, engaging in informal coordination of discovery and scheduling, and seeking Section 1404 transfer of one or more of the subject cases). In this case, alternatives to centralization are readily available and are already in place. Formal centralization, on the other hand, will only drive-up burdens and costs.

I.   **Centralization would undermine the just and efficient conduct of this litigation because individualized questions predominate and more efficient and cost-effective alternatives are available.**

Individualized questions about each individual patient and IVF clinic would overwhelm any centralized litigation. Alternatives for informal coordination are available and should be exhausted before transfer, if ever. The Panel should therefore deny centralization. While plaintiffs may point to CooperSurgical and CooperCompanies' agreements to allow cases to be deemed related in the Northern District of California, these agreements were based on efficiencies related to Defendants' Motions to Dismiss which present threshold issues challenging the appropriateness of the venue and jurisdictional issues.

A.   **Individualized questions about patient characteristics and clinic practices and procedures will dominate pretrial.**

Individualized issues of fact make centralization unwarranted and unnecessary. *See In re Electrolux Dryer Prods. Liab. Litig.*, MDL No. 2477, 2013 WL 5719111, at *1 (J.P.M.L. Oct. 16, 2013) (denying motion to create e MDL because individualized facts would predominate over common factual issues); *In re Wells Fargo Bank, N.A., Mtg. Corp. Force-Placed Hazard Ins. Litig.*, 959 F. Supp. 2d 1363, 1364 (J.P.M.L. 2013) (denying motion to create MDL because "individualized discovery and legal issues still will be substantial"); *In re Adderall XR Mktg., Sales Pracs. & Antitrust Litig.*, 968 F Supp. 2d 1343, 1345 (J.P.M.L. 2013) (denying motion to create MDL because the actions did not "significantly overlap"). Because of client- and clinic-specific questions, centralization is not appropriate.

Discovery and pretrial proceedings in this litigation will focus on each individual patient (both female and male) and each individual fertility clinic with little overlap, if any, among the cases. Patient-specific factors impacting IVF success include medical history, age, diagnosis, and ovarian reserve. Clinic-specific factors, evidenced by differences in success rates, include the practices and procedures concerning temperature, humidity, carbon dioxide, workstation design and engineering, dish preparation, incubators, egg recovery, sperm preparation, light, and others. Again, more than sixty different IVF providers across the country received affected media, each with its own technicians, employing its own practices and procedures, with no input from CooperSurgical. Some plaintiffs even allege the media was used by IVF providers *after* CooperSurgical issued the recall notice.

Only by delving into these patient- and clinic-specific factors can the parties determine whether the recalled culture media or something else impacted Plaintiffs' embryos and eggs. Under similar circumstances, the Panel has declined to centralize. *See, e.g.*, *In re Hotel Indus. Sex Trafficking Litig. (No. II)*, MDL No. 3104, 2024 WL 1596932, ___ F. Supp. 3d ___ (J.P.M.L. 2024) (denying centralization because the cases involved "different hotels, different alleged sex trafficking ventures, different hotel brands, different owners and employees, different geographic locales, different witnesses, different indicia of sex trafficking, and different time periods"); *In re New York Department of Corrections and Comty. Supervision Medications with Abuse Potential Prisoner Litig.*, MDL No. 3086, 2023 WL 8539909, ___ F. Supp. 3d ___ (J.P.M.L. 2023) (denying centralization because the litigation "involves a unique inmate who was incarcerated at a unique facility and whose death necessarily occurred in unique circumstances"). It should likewise decline to do so here.

**B.      Individualized patient- and clinic-specific issues will be overwhelming.**

Instead of acknowledging the need to grapple with the individualized questions of patient- and clinic-specific success factors, Plaintiffs identify four issues they claim support centralization. Their assertion is easily debunked and do not give rise to common questions of fact under § 1407. Plaintiffs assert that common questions arise from allegations that (1) CooperSurgical's IVF media was "defective," (2) CooperSurgical issued a recall for certain lots of its media, (3) all Plaintiffs allege the "defective" media damaged their eggs and embryos, and (4) all Plaintiffs plead similar causes of action. (Pls.' Mem., Doc. No. 46:1-1, at 4.). Further, choice-of-law issues, which go unmentioned in Plaintiffs' complaints and the memorandum supporting centralization, greatly impact *what* facts will matter for each case, especially regarding whether Plaintiffs' claims for damages are even cognizable and compensable in the first place, in addition to the differences in the fundamental elements of their claims.

First, whether the IVF media was "defective" is not a *factual* determination. Indeed, the term "defect" is necessarily a legal one to be decided based on the state law that will apply to each different case, with different definitions based on the places where the different IVF clinics used the recalled media. Plaintiffs never address the material deviations across state law when it comes to whether the culture media was "defective" and how that might change the discovery process.

Second, the recall is a matter of public record, not a fact to be determined that would be aided by centralization. The recall was limited to three lots of IVF media culture, manufactured in *one day*, and recalled within weeks of release. The small set of documents and materials behind the recall are not comparable to the breadth of issues in the centralized matters cited by Plaintiffs,[3]

---

[3] Pls.' Mem., Doc. No. 46 at p. 5-6 *(citing In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., and Prods. Liab. Litig.*, 220 F. Supp. 3d 1356, 1357–58 (J.P.M.L. 2016); *In re Power Morcellator Prods. Liab. Litig.*, 140 F. Supp. 3d 1351, 1353 (J.P.M.L. 2015); *In re Cook Medical,*

where complicated issues of fact, like the overall risk/benefit profile of a medical device and the clinical support for its accompanying warnings, were dominant. Centralizing this litigation based on what happened at CooperSurgical's facility on one day in 2023 would achieve no meaningful efficiency—especially given the overarching nature of the individualized inquiries that will inevitably occur.

Plaintiffs' third cited common question of fact, the impact of the recalled media culture on their eggs and embryos, cuts against centralization. It's the only one of Plaintiffs' proposed bases that requires extensive discovery and pretrial proceedings. Addressing that question will require individualized analysis of patient-specific and clinic-specific factors affecting how the recalled media was used, when it was used (including potentially after the recall) and the success of IVF. Both CDC data and the Consensus Guidelines recognize that a host of factors, beyond culture media integrity, determine the success or failure of IVF. However, because patient and clinic factors vary so widely, analysis of them must be conducted patient by patient and clinic by clinic, not litigation-wide. *Cf. In re Unumprovident Corp. Sec., Derivative & "ERISA" Litig.*, 280 F. Supp. 2d 1377, 1379 (J.P.M.L. 2003) (cited by Plaintiffs and recognizing centralization is appropriate only when core factual allegations "can be expected to focus on a significant number of common events, defendants, and/or witnesses"). There is nothing common about Plaintiffs or the clinics they used, nor any assurance that centralization would promote efficiency or convenience—the same individualized, case-specific discovery will need to be conducted as to each set of plaintiffs and each of their providers regardless. Witnesses will be spread across the country, from the parties themselves, to medical professionals like primary care and other treating

---

*Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 949 F. Supp. 2d 1373, 1375 (J.P.M.L. 2013)'; and *In re Wright Med. Tech., Inc., Conserve Hip Implant Prods. Liab. Litig.*, 844 F. Supp. 2d 1371, (J.P.M.L. 2012))

physicians, to the clinic personnel (embryologists, technicians, or nurses). Even whether a plaintiff received the recalled media, and then how it was used (before or after the recall, during transfer, as a holding solution, and/or for embryo development), and the duration it was used for, is necessarily an individualized determination not assisted by centralization.

Unlike in Plaintiffs' cited cases, discovery and pretrial proceedings here will focus heavily on individualized questions about the specific use of the media and the alleged impact to Plaintiffs' embryos and eggs. Did patient medical condition, age, and diagnosis jeopardize the success of the IVF procedure? What effect did each clinic's practices and procedures have on each patient's cycle and IVF outcome? Certain procedures such as genetic testing of embryos carry risk. What impact did those procedures have on individual IVF outcomes? Patient factors in the cases cited by Plaintiffs, while important, were subordinate to the larger, common questions of general causation. *See, e.g.*, *In re Roundup Prods. Liab. Litig.*, 214 F. Supp. 3d 1346, 1348 (J.P.M.L. 2016) (ordering transfer after finding that "[i]ssues concerning general causation, the background science, and regulatory history will be common to all actions"). When individualized questions overwhelm common ones, the Panel denies transfer and centralization. *See, e.g., In re Cordarone (Amiodarone Hydrochloride) Mktg., Sales Pracs. and Prods. Liab. Litig.*, 190 F. Supp. 3d 1346, 1348 (J.P.M.L. 2016) (denying transfer in part because the drug and medication guide were "dispensed at different times and at different locations").[4]

---

[4]   *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 793 F. Supp. 1098 (J.P.M.L. 1992), is distinguishable for yet another reason. That MDL centralized litigation involving thousands of plaintiffs, hundreds of attorneys, and more than 15 defendants. *Id.* at 1099. Litigation of that size and magnitude could be coordinated and streamlined efficiently only through centralization in an MDL. As discussed below, alternatives for efficient and effective streamlining and coordination of this litigation are readily available and should be pursued before this Panel orders transfer, if ever.

Finally, Plaintiffs' fourth cited common question is also *not* a question of fact. That all complaints allege the same general legal claims or theories matters very little when the factual questions cannot be addressed in a centralized fashion. Centralization under § 1407 is appropriate only for common questions of fact, not allegedly common legal claims. Moreover, Plaintiffs' conclusory characterization of these cases as all alleging supposedly similar causes of action ignores the reality that their claims will all vary depending on the law that applies. But one thing is certain—there is no holistic, unitary cause of action alleged. For example, while these cases may all baldly allege "negligence," as courts recognize, there is no uniform claim for "negligence" across the States. Rather, the laws on negligence vary. *Matter of Rhone-Poulenc Rorer, Inc.* (7th Cir. 1995) 51 F.3d 1293, 1300-1302 (finding that the states have "differing state pattern instructions on negligence and differing judicial formulations of the meaning of negligence and the subordinate concepts" and that there are "differing state views on the role of industry practice or custom in determining the existence of negligence." As do the laws with respect to other claims alleged, like strict liability, with many states (e.g., Virginia) not even recognizing such, while other states subsume claims involving product liability under statutory acts with their own specific elements (e.g., Ohio). Plaintiffs ignore the impact of the varying state laws when it comes to assessing their asserted commonality of facts.

In all, Plaintiffs fail to demonstrate that common questions of fact support centralization of these proceedings for the convenience of the parties and witnesses or to promote the just and efficient conduct of the actions under Section 1407.

### C.   Alternatives to centralization can and should be exhausted prior to § 1407 transfer.

Alternatives to § 1407 transfer exist, but Plaintiffs have not pursued them. Those alternatives should be pursued before the Panel orders transfer, if ever. "The Panel has often stated

that centralization under Section 1407 'should be the last solution after considered review of all

other options,'" including "coordination among the parties and the various transferor courts." *In*

*re: Gerber Probiotic Prods. Mktg. & Sales Pracs. Litig.,* 899 F. Supp. 2d 1378, 1379 (J.P.M.L.

2012) (internal citation omitted). Voluntary cooperation is a preferable "[a]lternative[] to transfer

. . . that may minimize whatever possibilities could arise of duplicative discovery." *In re Table*

*Saw Prods. Liab. Litig.,* 641 F. Supp. 2d 1384 (J.P.M.L. 2009); *In re: Rite Aid Corp. Wage & Hour*

*Empl. Pracs. Litig.,* 655 F. Supp. 2d 1376, 1377 (J.P.M.L. 2009) (denying centralization and noting

"[c]ooperation among counsel and the parties is particularly appropriate here, where plaintiffs in

four of the six actions encompassed by the motion share counsel"). Informal coordination is also

preferable when transfer would involve relatively few actions. *See In re Transocean Ltd. Secs.*

*Litig.,* 753 F. Supp. 2d 1373, 1374 (J.P.M.L. 2010) (citing *In re Royal Am. Indus., Inc. Sec. Litig.,*

407 F. Supp. 242, 243 (J.P.M.L. 1976) ("where only a minimal number of actions are involved,

the moving party generally bears a heavier burden of demonstrating the need for centralization.").

These considerations undermine Plaintiffs' motion.

Informal coordination by counsel is a reasonable alternative to formal centralization. In

this litigation, two firms—Girard Sharp and Lieff Cabraser—represent Plaintiffs in 25 of the 30

cases listed in the Schedule of Actions. Indeed, Plaintiffs in the *Woods* case pending in the

Northern District of California are represented by both firms. (*See* ECF No. 45:1-17, at p. 2.)

Coordination of all cases led by two sophisticated firms with the vast majority of cases is the better,

more straightforward approach. *See In re Cordarone*, 190 F. Supp. 3d at 1348 (denying

centralization in part because "[m]ost plaintiffs in the constituent actions are represented by either

or both of two law firms").

Informal coordination is already underway in the Northern District of California before the Honorable Jon S. Tigar. As Plaintiffs acknowledge, "The majority of cases, twenty-seven out of thirty, are pending in the Northern District of California, including the first filed case . . . and the only class action." (Pls.' Mem., ECF No. 45:1-1, at p. 8.) To the extent necessary, proceedings before Judge Tigar can be easily applied by stipulation where and as potentially appropriate to cases in other Districts without imposing the added burdens and complexities accompanying formal centralization in one forum.

Informal coordination between the two firms representing the majority of Plaintiffs and the one firm representing both current Defendants is also preferred to centralization because of the narrow scope of the sole common question involved. The parties may conduct whatever minimal discovery is needed of CooperSurgical regarding the recall through informal coordination without allowing that narrow issue to hijack the litigation—the documents and witnesses on that issue will be limited as compared to the individualized Plaintiff-side discovery. As the Panel has observed, "[n]otices of deposition can be filed in all related actions; the parties can stipulate that any discovery relevant to more than one action can be used in all those actions; or the involved courts may direct the parties to coordinate their pretrial activities." *In re Trans Union LLC Fair Credit Reporting Act (FCRA) Litig.,* 923 F. Supp. 2d 1374, 1375 (J.P.M.L. 2013); *see also In re: Nutek Baby Wipes Prods. Liab. Litig.,* 96 F. Supp. 3d 1373, 1374 (J.P.M.L. 2015) (denying transfer and citing willingness to cooperate in discovery and scheduling matters); *In re Eli Lilly & Co. "Oraflex" Prods. Liab. Litig.,* 578 F. Supp. 422, 423 (J.P.M.L. 1984) (willingness to make common discovery available to other actions factor in denying transfer). This one narrow issue can be handled efficiently, economically, and conveniently without MDL centralization.

**II.     Centralization is unnecessary and unwarranted, but, if ordered, the Panel should transfer to one of the Districts of Connecticut, Massachusetts, or Minnesota.**

Centralization of this litigation generally is unnecessary and should be denied. But if §
1407 transfer were to be ordered, convenience and location of the parties and witnesses support
centralization in Connecticut, Massachusetts, or Minnesota. But centralization in any California
district, would be particularly ill-advised.

This Panel has indicated that it considers several factors in deciding where and to whom to
transfer litigation. Among those factors are the geographical centrality and convenience of the
district, the likelihood of additional actions being filed in the district, the docket of the proposed
transferee court, the location of the parties and witnesses, and the preference of the parties. *See*
FEDERAL PRACTICE AND PROCEDURE:   JURISDICTION AND RELATED MATTERS § 3864.
Consideration of these factors should lead the Panel to transfer this litigation, if at all, to the
Districts of Connecticut, Massachusetts, or Minnesota.

First, the moving Plaintiffs' preferred venue is neither geographically central nor
convenient for most parties and witnesses. All but one Plaintiff household  resides and had their
IVF procedures elsewhere. According to the Complaints, Plaintiffs reside in China, District of
Columbia, Florida, Illinois, Iowa, Massachusetts, Michigan, New Mexico, New York, North
Carolina, Oregon, Pennsylvania, Texas, and Virginia. A more eastern venue is surely more
centrally located and convenient for everyone. With the majority of Plaintiffs and the relevant
defendants residing along the Eastern Seaboard, the District of Connecticut (home to
CooperSurgical) or the District of Massachusetts (home to Embryotech) would be more centrally
located and convenient. Apart from the one Plaintiff household added to the class action to avoid
the jurisdiction and venue issues of the other cases in the Northern District of California, only the
Plaintiffs' lawyers reside in California, hardly a determinative factor. Of course, a centrally located

District would be middle-of-the-country Minnesota. The only reason the majority of cases are pending in Plaintiffs' proposed venue is because of their own forum-shopping and improper naming of The Cooper Companies as a defendant, which neither designed, manufactured, nor sold the recalled media.

Second, the Girard Sharp and Lieff Cabraser firms will no doubt file additional cases with the same jurisdictional and venue problems in the Northern District of California, but other firms representing non-California residents doubtfully will in other venues. Speculative projections of a mass influx of cases, without more, does not mandate transfer.

Third, the dockets of the Districts of Connecticut, Massachusetts, and Minnesota are less congested than the Northern District of California. According to statistics published by the Administrative Office of the U.S. Courts, 8,341 civil cases were filed in the Northern District of California in 2023 compared to 1,777 in Connecticut, 3,166 in Massachusetts, and 3,825 in Minnesota.[5] The District of Connecticut does not currently have an MDL, the District of Minnesota has six MDLs, and the District of Massachusetts currently has five MDLs. The Northern District of California, by contrast, has 13 MDLs, two of which are assigned to Judge Tigar. Considering these relative caseloads, the Districts of Connecticut, Massachusetts, and Minnesota have greater capacity to administer an MDL than the Northern District of California. (*See* Pls.' Mem., ECF No.

---

[5] https://www.uscourts.gov/sites/default/files/data_tables/jff_4.2_0930.2023.pdf (last visited July 17, 2024).

45:1-1, at 8 (acknowledging the importance of transfer to a District with capacity to handle the litigation).)[6] Districts of Connecticut, Minnesota, or Massachusetts would be better suited.[7]

**CONCLUSION**

Transfer of this litigation pursuant to § 1407 for centralized pretrial proceedings is unnecessary and unwarranted and will undermine the efficient, convenient, and just conduct of the actions. Individualized questions of fact concerning the impact on Plaintiffs' eggs and embryos are overwhelming. Individualized patient by patient and clinic by clinic inquiry required to determine causation is unavoidable regardless of whether the litigation is centralized. Choice of law issues will complicate any centralized process. Whatever benefit to be realized from coordinated proceedings can effectively and efficiently be achieved informally.

If the Panel is inclined to order transfer, however, it should reject Plaintiffs' proposed venue and instead transfer to the Districts of Connecticut, Massachusetts, or Minnesota, which have the experience and capacity to manage this litigation—they are centrally located near most Plaintiffs and significant witnesses from Embryotech and CooperSurgical. But, again, transfer is unnecessary and inappropriate.

Accordingly, Defendants respectfully request the Panel to deny Plaintiffs' motion and deny transfer. Alternatively, if the Panel decides to transfer, it should transfer this litigation to the Districts of Connecticut, Massachusetts, or Minnesota.

---

[6] It is true that no constituent action is pending in the Districts of Connecticut, Massachusetts, or Minnesota. That fact, however, does not prevent transfer to one of those Districts when other factors, including central location, convenience, and relative caseloads, make them appropriate transferees. *See* FEDERAL PRACTICE AND PROCEDURE: JURISDICTION AND RELATED MATTERS § 3864.

[7] The Districts of Massachusetts and Minnesota are especially well-suited because they both have recent experience with medical device MDLs.

Dated: July 23, 2024

     */s/ Molly Jean Given*

Molly Jean Given
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1600 Utica Avenue South, Suite 600
Minneapolis, MN 55416
Telephone: (612) 464-4500
Facsimile: (612) 255-0739
Mollyjean.given@nelsomullins.com